BARRY J. PORTMAN
Federal Public Defender
NED SMOCK
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant MUSCADINE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>GARY MUSCADINE,<br><br>  Defendant. | No. CR-09-0641 SBA<br><br>DEFENDANT'S NOTICE, MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE<br><br>Date: April 6, 2010<br>Time: 11:00 a.m. |

MOTION TO SUPPRESS STATEMENTS
No. CR-09-0641 SBA

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 2

FACTS ........................................................................ 2

ARGUMENT ..................................................................... 3

    I.    MR. MUSCADINE WAS IN CUSTODY FOR PURPOSES OF THE
          *MIRANDA* RULE ..................................................... 3

    II.   MR. MUSCADINE'S STATEMENTS WERE MADE IN RESPONSE
          TO POLICE INTERROGATION AND WERE NOT VOLUNTEERED ............. 6

CONCLUSION .................................................................. 10

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Miranda v. Arizona*, 384 U.S. 426 (1966) .................................. 2, 3, 4

*Rhode Island v. Innis*, 446 U.S. 291 (1980) .................................. 6, 7

*United States v. Andaverde*, 64 F.3d 1305 (9th Cir. 1995) .................... 9, 10

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) ................... 4, 5

*United States v. Green*, 272 F.3d 748 (5th Cir. 2001) ........................ 7

*United States v. Hayden*, 260 F.3d 1062 (9th Cir. 2001) ...................... 4

*United States v. Henley*, 984 F.2d 1040 (9th Cir. 1993) ...................... 4, 8, 9

*United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983) ................ 8

*United States v. Padilla*, 387 F.3d 1087 (9th Cir. 2004) ..................... 6, 7, 8

*United States v. Rodriguez-Preciado*, 399 F.3d 1118 (9th Cir. 2005) .......... 10

*United States v. Soto*, 953 F.2d 263 (6th Cir. 1992) ......................... 8

BARRY J. PORTMAN
Federal Public Defender
NED SMOCK
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant MUSCADINE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) No. CR-09-0641 SBA |
|---|---|
| Plaintiff, | ) |
| | ) DEFENDANT'S NOTICE, MOTION AND |
| | ) MEMORANDUM IN SUPPORT OF |
| vs. | ) MOTION TO SUPPRESS EVIDENCE |
| | ) |
| GARY MUSCADINE, | ) Date: April 6, 2010 |
| | ) Time: 11:00 a.m. |
| Defendant. | ) |

TO: UNITED STATES OF AMERICA, PLAINTIFF; AND JOSEPH RUSSONIELLO, UNITED STATES ATTORNEY; AND JAMES MANN, ASSISTANT UNITED STATES ATTORNEY

PLEASE TAKE NOTICE that counsel for defendant Gary Muscadine hereby moves this Court for an order suppressing evidence of all statements he made to police on June 5, 2009.

The motion is based on this notice and motion, the following memorandum of points and authorities, the Fifth, Sixth and Fourteenth amendments to the United States Constitution and all other applicable constitutional, statutory and case authority, and such evidence and argument as may be presented at the hearing of this motion.

MOTION TO SUPPRESS STATEMENTS
No. CR-09-0641 SBA                                           1

## INTRODUCTION

In this motion, defendant Gary Muscadine moves to suppress statements that Oakland Police Department officers report eliciting from him during a custodial interrogation. Because the officers at no time during the interrogation issued the warnings required under *Miranda v. Arizona*, 384 U.S. 426 (1966), and because the statements attributed to Mr. Muscadine were made in response to interrogation and not spontaneous, the Court must suppress them.

## FACTS

On June 5, 2009, Gary Muscadine was standing outside on the 1500 block of 28th Avenue in Oakland. Two Oakland Police Department officers, Officers Mendoza and Keely, observed Mr. Muscadine talking to his girlfriend, who was inside a parked car. *Exhibit A, June 5, 2009 Oakland Police Report ("Police Report")*. Officer Keely recognized Mr. Muscadine as a parolee. *Id.*

Mr. Muscadine noticed several police cars pull up next to him. *Exhibit B, Declaration of Gary Muscadine ("Muscadine Decl."), at ¶ 1*. Several officers got out of their cars. An officer then approached Mr. Muscadine and stated, "this one is on parole," and placed him in handcuffs. *Id. at ¶ 2*. Mr. Muscadine remained in handcuffs for the duration of the events described below.

After handcuffing Mr. Muscadine, the police officer searched his person. *Police Report*. The officer then asked Mr. Muscadine where he lived. *Id.* Mr. Muscadine directed them to an apartment in the building adjacent to where they were standing. *Id.* The officers took Mr. Muscadine inside the apartment and sat Mr. Muscadine down on the couch. *Muscadine Decl. at ¶ 2*. Several of the officers then began conducting a search of the apartment. *Id.*

While police officers searched the apartment, Officer Mendoza began asking Mr. Muscadine questions. *Id. at ¶ 3*. During the course of the search, the officer asked Mr. Muscadine repeatedly whether there were drugs in the apartment, or any other contraband. *Id.* At one point during the search, Officer Mendoza said to Mr. Muscadine, "Let me know if you have anything. If you have got nothing, you have nothing to worry about." *Id.* As the search

continued, Officer Mendoza repeatedly asked Mr. Muscadine: "Are you sure you don't have any drugs? Let us know." *Id.* After a while, an officer came out of the bedroom holding a gun. The officer said: "Bingo." *Id. at ¶ 4.*

The officers then took Mr. Muscadine, who remained handcuffed, to a police cruiser, where he sat for about 30 minutes. *Id. at ¶ 5.* While he was held in that police car, an officer came into the car and asked Mr. Muscadine who the gun belonged to. *Id.* This officer stated that if Mr. Muscadine did not tell the police "what was really going on," Mr. Muscadine's girlfriend would be going to jail, and his daughter would be taken away. *Id.* That officer then got out of the police cruiser. *Id.*

Shortly thereafter, the police moved Mr. Muscadine to another police cruiser. *Id. at ¶ 6.* Seated in that police car with Mr. Muscadine were Officers Keely and Mendoza, who started driving the car to the jail. *Id.* Officer Mendoza was the police officer who had been questioning Mr. Muscadine in the apartment. Officer Keely told Mr. Muscadine that he was under arrest. *Police Report.* Mr. Muscadine was worried about the threats the other officer had made about taking Adriana to jail if he did not talk, as well as the threat to have his child taken away. *Muscadine Decl. at ¶6.* Mr. Muscadine asked the officers where his girlfriend was. *Id.* The officers responded that she was up in the apartment and that she was "fed up with [defendant's] shit." Mr. Muscadine then spoke to the officers. *Id.*

At no point during any of these events did the police read his *Miranda* rights to Mr. Muscadine. *Muscadine Decl., ¶7.*

## ARGUMENT

I.   MR. MUSCADINE WAS IN CUSTODY FOR PURPOSES OF THE *MIRANDA* RULE

Police must give *Miranda* warnings when they subject a person to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A person is in custody for *Miranda* purposes when the police have established a setting from which a reasonable person would believe that he

or she was not free to leave. *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001). In cases where the suspect has not formally been taken into police custody, "a suspect is nevertheless considered 'in custody' for purposes of Miranda if the suspect has been 'deprived of his freedom of action in any significant way.'" *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008), quoting *Miranda*, 384 U.S. at 444.

Notably, in a case with facts similar to the present one, the Ninth Circuit said the custody question was "easily resolved," in favor a determination that the defendant was indeed in custody for *Miranda* purposes. *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993). *Henley* involved a bank robbery suspect who was handcuffed and placed in the back of a squad car, and then questioned by an FBI agent who identified himself as such. In *Henley*, even though the defendant was explicitly told that he was not under arrest, the Ninth Circuit said it had "no trouble" concluding that Mr. Henley was in custody for purpose of *Miranda*, stating: "It is fair to say that someone who is being questioned by an FBI agent while sitting handcuffed in the back of a police car is, indeed, not free to leave." 984 F.3d at 1042.

In the present case, Mr. Muscadine, like Mr. Henley, was handcuffed, placed in the backseat of two different police cars, and faced questioning from law enforcement officers. The Ninth Circuit has already determined that this set of facts constituted a straightforward example of being in custody for purposes of *Miranda*. In fact, the facts in the present case point even more toward a finding of custodial status, because while the defendant in *Henley* was told that he was not under arrest, the defendant here was never given that assurance, thus giving further support for a reasonable belief that he was not free to leave.

Another case that supports a finding that Mr. Muscadine was in custody for *Miranda* is the Ninth Circuit's recent ruling in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). In *Craighead*, the court determined that questioning by law enforcement which took place at a child pornography suspect's home during execution of a search warrant there constituted custodial interrogation, despite the fact that (1) the suspect was told that he was not under arrest, (2) he

MOTION TO SUPPRESS STATEMENTS
No. CR-09-0641 SBA                                       4

was informed at the outset of his encounter with police that he was free to leave, and (3) he was never placed in handcuffs. In making this determination, the court in *Craighead* relied in large part on the fact that the interrogation took place in the home of the suspect during the execution of a lawful search, stating that a suspect in this situation "may not feel he can successfully terminate the interrogation if he knows he cannot empty his house of interrogators until they have completed their search." 539 F.3d at 1083. While the court in *Craighead* noted that an interrogation inside a suspect's home is not per se custodial, it emphasized that this situation does become custodial when an interrogation "turn[s] the otherwise comfortable and familiar surroundings of the home into a police-dominated atmosphere." *Id.*

The Ninth Circuit determined in *Craighead* that the police questioning during the execution of a search warrant in the suspect's home was custodial despite the fact that he was not handcuffed and he was told that he was not under arrest, and – in comparison to situation in *Craighead* – the facts in the present case point more even more decisively toward a finding that Mr. Muscadine's questioning was custodial. Like the defendant in *Craighead*, Mr. Muscadine witnessed numerous officers conducting a search in his home, which defendant knew he had no choice to terminate. But Mr. Muscadine was further constricted by the handcuffs that he wore from the outset of his contact with the officers, and no police officer ever informed him that he was not under arrest or that he was free to go.

In sum, it is clear that Mr. Muscadine was in custody for purposes of *Miranda*. As was set forth above, the facts in Mr. Muscadine's case point even more strongly to a finding of custody than other situations where the Ninth Circuit has determined that the suspects were in custody for *Miranda* purposes, such as in *Henley* and *Craighead*. The Court should thus make a finding that the officers' interrogation of Mr. Muscadine was "custodial" and triggered the protections of *Miranda*. Because there was no valid *Miranda* advisement or waiver here, the statements elicited during this custodial interrogation must be suppressed.

## II. MR. MUSCADINE'S STATEMENTS WERE MADE IN RESPONSE TO POLICE INTERROGATION AND WERE NOT VOLUNTEERED

According to police, Mr. Muscadine made certain statements during his custodial interrogation with police officers on June 5, 2009. Because Mr. Muscadine made these statements in response to interrogation by the police and not spontaneously, they must be suppressed.

When a suspect who is in custody makes statements without having been given *Miranda* warnings, those statements must be excluded if they are the result of interrogation. *United States v. Padilla*, 387 F.3d 1087, 1093 (9th Cir. 2004). Interrogation in the *Miranda* context can be either express questioning or its functional equivalent. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The functional equivalent of express questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that *the police should know are reasonably likely to elicit an incriminating response from the suspect*." *Innis*, 446 U.S. at 301 (emphasis added). In turn, an "incriminating response" refers to "any response – whether inculpatory or exculpatory – that the prosecution may seek to introduce at trial." *Id.*

In this case, the police engaged in a course of interrogation which led to Mr. Muscadine's incriminating statement about the gun. As noted in Mr. Muscadine's declaration, the following instances of interrogation took place:

- While one officer searched the apartment, Officer Mendoza stayed at Mr. Muscadine's side. Officer Mendoza asked Mr. Muscadine whether there were drugs or other contraband in the house. The officer said, "Let me know if you have anything. If you have nothing, you have nothing to worry about." As the search continued, the officer repeatedly asked Mr. Muscadine, "Are you sure you don't have any drugs? Let us know."

- An officer came out of the bedroom, holding a gun, and stated in front of Mr. Muscadine: "Bingo."

- When Mr. Muscadine was sitting in a police car, an officer came into the vehicle and asked him who the gun belonged to. The officer also told Mr. Muscadine that if he did not tell him what was "really going on", Mr. Muscadine's girlfriend would go to jail, and their daughter would be taken away from them.

- When Mr. Muscadine was placed into a second police cruiser with Officer Mendoza – the same officer who had been questioning him repeatedly in the apartment – and another

MOTION TO SUPPRESS STATEMENTS
No. CR-09-0641 SBA                                               6

officer, Mr. Muscadine was told he was under arrest. Mr. Muscadine asked them where his girlfriend was, to which the officers replied that she was "fed up with all [his] shit." After this final sequence of interrogation, the officers report that Mr. Muscadine gave a statement.

Each of these sets of questions and conduct by the police fit the definition of interrogation, because they were behaviors that the police in that case should have known was reasonably likely to elicit an incriminating response from Mr. Muscadine. *See Innis*, 446 U.S. at 301. Courts evaluating similar sets of facts have determined that those same types of questions by the officers, taken in context of what information the police needed to make their case, constituted interrogation, and the same finding is required here.

For example, in *United States v. Green*, 272 F.3d 748, 752 (5th Cir. 2001), the Fifth Circuit held that a defendant – who was suspected of being a felon in possession of a firearm – was subject to interrogation for purposes of *Miranda* when, during the execution of a search warrant in his home, the agent asked defendant to show him where the guns in the house were and to assist the agent in the search. Similarly, here Mr. Muscadine was plainly subject to interrogation when, during the search of his home, the officer repeatedly asked Mr. Muscadine to tell him where the drugs and contraband were. *See also Padilla*, 387 F.3d at 1093 (noting that questioning constitutes interrogation where incriminating information would be "a natural result" of the question asked).

Another instructive interrogation case is *United States v. Padilla, supra.* In *Padilla*, a federal agent went to a state prison and told the inmate, Mr. Padilla, that federal gun charges were pending and this was defendant's "last chance to cooperate" on another case about which the agent believed Mr. Padilla possessed information. 387 F.3d at 1093. Mr. Padilla responded to this by making a statement that the government used against him in his trial on the federal gun charge.

On appeal, the Ninth Circuit ruled that the agent's "last chance to cooperate" statement constituted interrogation, because the agent should have known that it was likely to evoke an

MOTION TO SUPPRESS STATEMENTS
No. CR-09-0641 SBA                        7

incriminating statement, adding: "It is difficult to imagine any purpose for such a statement other than to elicit a response." *Padilla*, 387 F.3d 1093. As was the case in *Padilla*, here the police officer's threats to Mr. Muscadine – i.e., the statement that his girlfriend would go to jail and his child would be taken away if he did not talk, and the statement that his girlfriend was "fed up with all his shit" – constituted interrogation because it is difficult to imagine these statements had any purpose other than to induce Mr. Muscadine to incriminate himself. *See also United States v. Soto*, 953 F.2d 263, 264-65 (6th Cir. 1992) (per curiam) (determining that officer's communications constituted interrogation where officer, inspired by a photograph of defendant's family, asked "What are you doing with crap like that [gesturing toward the bag of heretofore unidentified drugs] when you have these two waiting for you at home").

More generally, the Ninth Circuit has repeatedly determined that questions or comments from law enforcement officers constitute interrogation when it is clear from the face of the statement that it is designed to gather information related to facts at issue in the case against the suspect. The court has stated that "the relationship of the question asked to the crime suspected is highly relevant" to the inquiry of whether a defendant was interrogated. *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983). For example, in *Henley*, *supra*, the agent's question about whether a suspect owned the car was deemed interrogation, because evidence about the car was used to tie the defendant to the robberies at issue in his case. 984 F.2d at 1043. The Ninth Circuit in *Henley* emphasized that while a question of car ownership might in many cases be a legitimate booking question, it was important to note the context of the question here, stating: "an officer investigating a bank robbery who has the getaway car but isn't sure who owns it should well know that asking a suspect if he's the owner of the vehicle is reasonably likely to elicit an incriminating answer." *Id.*

Applying these principles to the present case, it is clear that the questions and comments the police officers made to Mr. Muscadine constituted interrogation. The officer's questions and remarks were all related to crimes for which he was suspected (drugs and gun violations), and

1  thus they cannot be dismissed as mere booking questions or otherwise innocuous conversation.
2      Finally, despite the fact that the questions emanated from different officers in different
3  locations at various times in this sequence of events, the Court must evaluate the statements
4  attributed to Mr. Muscadine in the police cruiser as the product of this entire interrogation,
5  beginning at least as early as the comments and questions made by the police during the search of
6  the apartment, and culminating with Mr. Muscadine's statement while placed in the second
7  police car. In *Oregon v. Elstad*, the Supreme Court explained that "the finder of fact must
8  examine the surrounding circumstances *and the entire course of police conduct with respect to*
9  *the suspect* in evaluating the voluntariness of his statements." 470 U.S. 298, 318 (1985)
10 (emphasis added); *see also Henley*, 984 F.2d at 1043 (noting that "*Miranda* presumes
11 conclusively that all responses to custodial interrogation are *involuntary* unless preceded by the
12 prescribed warnings") (emphasis added). Put another way, the inquiry into whether a suspect
13 was interrogated is an examination of whether a statement was made voluntarily, and the
14 Supreme Court has instructed that the voluntariness inquiry requires a court to look to the whole
15 sequence of police conduct.
16     In *United States v. Andaverde*, 64 F.3d 1305 (9th Cir. 1995), the defendant was first
17 questioned by a police officer, then he was interrogated by a probation officer while the police
18 officer from the earlier questioning was still present. The Ninth Circuit determined that the
19 questioning by the probation officer was "essentially part of the police interrogation" with the
20 result that no new *Miranda* warnings were required for the subsequent questioning. 64 F.3d at
21 1312. In reaching this conclusion, the court in *Andaverde* emphasized that the presence of the
22 same officer, as well as the similarity of subject matter of the questioning, tied the incidents
23 together, despite the fact that defendant had been "moved into a different room and faced a new
24 interrogator." *Id.* at 1313. Similarly, in the present case, Officer Mendoza's earlier questioning
25 of Mr. Muscadine in the apartment, and then his subsequent presence in the police car after Mr.
26 Muscadine had been questioned and pressured by another officer, show that the sequence of

MOTION TO SUPPRESS STATEMENTS
No. CR-09-0641 SBA                                                                    9

events here were all part of one police interrogation. *See Andaverde*, 64 F.3d at 1312; *see also United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1129 (9th Cir. 2005) (stating the presence of the same police officer over the course of two days was a factor in its determination that interrogation continued without need for new *Miranda* warnings).

Moreover, the passage of time between the various instances of questioning in this case does not negate the fact that this was all one interrogation. As was noted above, the Ninth Circuit has determined that overnight breaks in questioning do not require a new *Miranda* warning. *See Rodriguez-Preciado*, 399 F.3d at 1312. Similarly, the unwarned statement made by a defendant here was the product of the entire sequence of interrogation despite the brief passage of time that occurred between the various instances of questioning. *See also Andaverde*, 64 F.3d at 1311 (noting that "[t]here is no rigid rule relating to the passage of time or a break in events" when determining whether a statement is voluntary).

In sum, the Court should suppress Mr. Muscadine's statements because they were the product of police interrogation and not spontaneous or volunteered.

## CONCLUSION

For the reasons stated above, the Court must suppress Mr. Muscadine's statements, because they were the result of custodial interrogation without the benefit of Miranda warnings.

Dated: February 18, 2010

                                    Respectfully submitted,

                                    BARRY J. PORTMAN
                                    Federal Public Defender

                                    /s/ Ned Smock

                                    NED SMOCK
                                    Assistant Federal Public Defender

# EXHIBIT A

06/09/2009  12:52      NARCOTICS CHARGING    PAGE 04

**OPD ADDITIONAL INFORMATION REPORT**
OAKLAND POLICE DEPARTMENT
455 - 7th Street
Oakland, CA 94607

RD # 09-038449

| CRIME | SUPPLEMENTAL | INCIDENT # | V 1 | VICTIM LAST, First, Mid |
|---|---|---|---|---|
| 12021(A)(1) PC | | | | State Of California |

| SUSPECT LAST, First, Mid | INCIDENT LOCATION | DATE OF THIS REPORT | ORIGINAL DATE REPORTED |
|---|---|---|---|
| Muscadine, Gary | 1507 28th Ave | 5 Jun 09 | |

**PROPERTY (and/or NARRATIVE)**
ITEM #  QNTY  ITEM TYPE, BRAND, MODEL #, SIZE, COLOR, MARKS, ETC   SERIAL #   VALUE

Evidence:
1. One Rifle, Browning long rifle, Serial # 05814PX146. I found it in S#1's bedroom under his bed. I recovered it and later turned it into OPD property.

2. Several pieces of indicia, including photos of S#1, family and gang photos, Tax paper, school paper and jail letters. I also located S#1's social security card through out S#1's bedroom.. I recovered it and later turned it into OPD property.

Summary:  On 05 Jun 09 at about 1130 hours I was working as OPD Gang Unit 8a22 with Officer F. Mendoza #8178. We were wearing our daily uniform ( OPD Raid jackets) and we were driving in semi-marked vehicle #1148. We were traveling in the 1500 block of 28th Ave when I observed Gary Muscadine (Suspect #1) leaning into a vehicle. The vehicle was occupied by a female who turned out to be S#1's girlfriend (            ) I know S#1 to be a Parolee for 212.5 PC and a Norteno gang member. I stopped my vehicle to investigate. I called (S#1) by his name and confirmed with him that he is still actively on Parole. I detained S#1 into handcuffs and I searched his person.

I asked S#1 where he lived and he told me that he lived at the apartment complex we were standing in front of (1507 28th Ave). I had S#1 direct me to his apartment. I informed S#1 we were going to conduct a parole search of his home. S#1 became nervous but directed me to his apartment (#9, top floor). S#1 began to call for his girlfriend (later ID'd as W#1             ) as if he was trying to stall us. We entered the small two bedroom one bathroom apartment. No one was inside. S#1, told me that he only sleeps on the couch, however when I looked inside the master bedroom, it was clear that S#1 lived in that room. The room had clothes of both a man and a women, several photos of S#1, and indicia in his name. I recovered several photos and indicia from the room (evidence #2) these items include, gang photos of S#1, family photos, school paper work, tax paper, social security card).

Under the bed I located evidence #1, one 22 Cal rifle, Browning. The rifle handle and barrel had been cut down and the weapon is only about 16 inches in length. This weapon was clearly within S#1 control and possession. S#1 has a prior conviction for 212.5PC. I arrested S#1 for 12021 (a)(1) PC, ex-felon in possession of a firearm. The weapon had been cut down and was less than 26 inches in length a violation of 12020 (B) PC. I checked in AFS and learned that weapon is stolen out of San Francisco (report # 15126172). I also contacted parole agent Johnson who violated S#1's parole.

Officer Mendoza took a statement from W#1, who stated that she lives at 1507 28th Ave apartment #9 with her boyfriend, S#1  W#1's mother and her daughter also live at this address. W#1 states she did not know S#1 had a gun inside their bedroom. W#1 states, that she nor her mother own the firearm. (see W#1's statement)

I checked the other bedroom and it appeared to be female's bedroom, and there was indicia in W#1's mothers' name, 
Sgt Brandwood was on Scene and approved the arrest. There were no other witnesses

I told S#1 he was under arrest, but I did not show him the weapon or tell him the condition of the firearm (cut down). S#1 made spontaneous statement, " I just found that in the dumpster yesterday. ...does that cut down gun even work . .some youngster gave that to me"
These statements show that S#1 clearly knew about the firearm and that it was cut down  S#1 was transported to north county jail.

| REPORTED BY | SERIAL # | WATCH | AREA | SUPERVISOR | SERIAL # | |
|---|---|---|---|---|---|---|
| D.KEELY | 8287 | | | Sgt R. Brandwood | | Page 4 of 4 |

538-937 (1/97)     ORI 00109

GAM-0004

# EXHIBIT B

BARRY J. PORTMAN
Federal Public Defender
NED SMOCK
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant MUSCADINE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. CR-09-0641 SBA |
|---|---|---|
| Plaintiff, | ) | **DECLARATION OF GARY MUSCADINE** |
| vs. | ) | |
| GARY MUSCADINE, | ) | |
| Defendant. | ) | |

I, Gary Muscadine, declare the following to be true under penalty of perjury:

1. On June 5, 2009 at approximately 11:30 a.m., I was standing on the 1500 block of 28th Avenue in Oakland. I was speaking to my girlfriend, Adriana, when approximately four police cars pulled up.

2. The officers got out and approached me. One of the officers pointed at me and said: "This one is on parole," then put me in handcuffs. They took me inside apartment number 9 at 1507 28th Avenue and sat me on the couch. Several officers then began searching the apartment.

3. While the officers searched the apartment, Officer Mendoza stayed with me and questioned me. Officer Mendoza asked me whether there were drugs or any other

contraband in the apartment. He told me: "Let me know if you have anything. If you have got nothing, you have nothing to worry about." As the search continued, this officer kept asking me: "Are you sure you don't have any drugs? Let us know."

4. After a while, an officer came out of the bedroom holding a gun. That officer said "Bingo."

5. Officers then took me - still in handcuffs - to a police cruiser, where I remained for approximately 30 minutes. While I was in the back of the cruiser, a blonde officer came into the vehicle and asked me to tell him who the gun belonged to. He told me that if I did not tell him what was really going on, my girlfriend Adriana would be going to jail and my daughter would get taken away. He then got out of the cruiser.

6. I was then transferred to a different police cruiser with Officers Keely and Mendoza and they started to drive me to jail. Officer Mendoza had already been questioning me inside the apartment. I also knew at that time that the other officer was threatening to take my girlfriend to jail if I did not talk to the officers. I asked the officers where my girlfriend was at that time. They told me that she was up in the apartment and that she was "fed up with my shit." I then spoke to the officers.

7. At no time did any police officer read me my rights.

FEB. 8. 2010
DATED

_____
GARY MUSCADINE

DECL. OF GARY MUSCADINE                    2